## W. R. Wallace, Appellant, v. Albert B. Yudelson, Appellee.

### Gen. No. 31,441.

1. MEDICINE AND SURGERY—*elements essential to recovery for malpractice.* Before a patient can recover damages for injuries alleged to have been caused by negligent treatment by a physician he must show by affirmative evidence that, in the first place, the defendant was unskilful or negligent, and, secondly, that the defendant's want of care or skill caused the patient's injury.

2. MEDICINE AND SURGERY—*when evidence insufficient to show malpractice.* Without skilled medical and surgical expert testimony affirmatively showing that a physician's treatment was improper or negligent, proof only that he was mistaken in his diagnosis will not warrant judgment for the patient.

3. MEDICINE AND SURGERY—*when negligence of operating surgeon cannot be implied to attending physician.* The possible negligence of a surgeon in operating in the wrong place cannot be imputed to a physician who, though present at the operation, took no part therein nor in selecting the point to operate nor had any part in employing the surgeon who operated, and therefore cannot be held liable in damages to the patient for the results of the operation.

4. EVIDENCE—*inadmissibility of answer to hypothetical question as speculative.* In an action for a doctor's malpractice, the evidence of a medical expert in answer to a hypothetical question that if a bony growth removed at a third operation had been removed at the first the patient would have been all right is so highly speculative, in assuming the growth existed at the prior operation, of which there was no evidence, as to be incompetent.

Appeal by plaintiff from the Circuit Court of Cook county; the Hon. BEN F. ANDERSON, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1926. Affirmed. Opinion filed May 17, 1927.

JOHN F. SHEA and B. H. T. BURRITT, for appellant; JOHN F. SHEA, of counsel.

EDWARD W. RAWLINS and HENDRIK FOLONIE, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

On July 17, 1923, plaintiff commenced an action in *case* against two physicians, William E. Schroeder and Albert B. Yudelson. The former was a surgeon and chief of staff of the Wesley Memorial Hospital, Chicago, and the latter a specialist in neurology, practicing in Chicago. Subsequently Dr. Schroeder died and the cause was abated as to him, but came on for trial in June, 1926, before a jury against Dr. Yudelson as sole defendant. Plaintiff was a witness in his own behalf and several witnesses testified for him. Defendant also testified at considerable length. At the conclusion of all the evidence the court instructed the jury to find defendant not guilty. Upon said verdict being returned, judgment for costs was entered against plaintiff and this appeal followed.

The declaration consists of five counts, to which defendants jointly filed a plea of the general issue. In the first count it is averred that on, to wit, August 18, 1921, plaintiff employed defendants in their professional capacity to ascertain, locate and diagnose the nature of a certain ailment or malady from which he then was suffering, and to treat him for the cure thereof, and, if they deemed it advisable, to operate upon him; that he fully informed them of the history of the ailment or malady, the location and character of his pains and the location and extent of the conditions of anesthesia with which he then was affected, etc.; and that defendants treated plaintiff for about a year, etc. It is then charged that during said time defendants "so carelessly, negligently and unskillfully conducted themselves in that behalf, in attending and treating plaintiff, that, *by and through the want of ordinary care and skill* upon their part as physicians and sur-

geons, his said sickness, ailment or malady then and there continued and became greatly increased and aggravated, and he underwent great and unnecessary pain and anguish and was obliged to undergo several operations, and became and is an incurable paralytic and a cripple for life," etc., to his damage, etc. The charge of the second count is substantially the same, though it is limited to defendants' negligent failure to correctly "diagnose" plaintiff's ailment or malady. In the third count it is charged that defendants "negligently, unskillfully and incorrectly diagnosed plaintiff's sickness, ailment and malady as a tumor on the spinal cord between the fifth and tenth dorsal vertebrae." In the fourth count it is charged that they negligently failed "to locate said tumor at the right place" and to remove the same, etc. In the fifth count it is charged, in substance, that they negligently diagnosed the tumor to be pressing on the spinal cord between said fifth and tenth dorsal vertebrae, and negligently performed unnecessary operations for its removal in that region, whereas by the exercise of ordinary care they should have diagnosed it to be between the first and third dorsal vertebra and should have removed it.

The following facts in substance are disclosed from the evidence: In December, 1920, while plaintiff was in Brazil, South America, and riding in a street car, he received a severe blow on his back. He was about 60 years of age. On his return to Chicago, about April 1, 1921, he was suffering from severe pains "emanating near the spine and terminating around in the breast," and he consulted Dr. Guy Van Alstine, who examined and treated him and suggested that Dr. Elliott, a specialist in lung diseases, be called in consultation. Dr. Elliott examined plaintiff, took X rays, and suggested that plaintiff be taken to a neurologist, and, on Van Alstine's recommendation, plaintiff, on May 4, 1921, consulted the defendant, Dr. Yudelson.

Wallace v. Yudelson, 244 Ill. App. 320.

After making an examination Yudelson told plaintiff that, to properly diagnose his trouble, observation and study would be required, and advised his going to a hospital. Plaintiff went to the Wesley hospital on the following day, with the approval of Van Alstine, and daily during the following week he was observed and examined by Yudelson, who made various tests. He told Yudelson the history of his case and that his pains seemed to be "below the shoulder blades where he was hit, and about the ribs down to the pit of the stomach." At this time plaintiff could walk, although "his gait was rigid and stiff and he scraped the floor with his toes." Yudelson told him that, as a result of his examination and tests, he was of the opinion that plaintiff had "an approaching paralysis" but that he could not localize the trouble, and suggested further examinations and treatments, and, also, that an operation might have to be performed to remove a possible tumor, near or pressing upon the spinal cord. Plaintiff stated that he was obliged to leave town on important business, and, against Yudelson's protests that he should not leave until the cause for his pains and condition had, if possible, been ascertained, left the hospital and went to a distant city. Yudelson made a full report to Dr. Van Alstine, whose patient plaintiff was. While plaintiff was away on his trip he noticed that his condition was becoming worse and that he "couldn't guide his legs," and he returned to Chicago sooner than he had planned. He again consulted Dr. Van Alstine who took him to Dr. Schroeder (former defendant). The latter, according to Van Alstine's testimony (plaintiff's witness) was a noted surgeon, "had done a great deal of neuro-surgery," had "great ability in surgery for nervous diseases," and who "generally operated where and when he thought it was necessary." Schroeder examined plaintiff and made suggestions to Van Alstine for the making by the latter of certain tests and treatments, which suggestions

Van Alstine followed. Van Alstine's treatments extended over a period of about eight weeks. During the early part of August, 1921, at the request of both Van Alstine and Schroeder, Yudelson was again called into the case, and he made thorough examinations of plaintiff and made other tests. At this time plaintiff was in bed and said he was unable to walk, and, in response to his inquiry as to possible relief by an operation, Yudelson expressed doubt if plaintiff would ever walk again or if an operation would help his condition, giving his reasons therefor, based upon his recent examinations and tests, and further stating that any operation would be more or less of a "fishing expedition." Yudelson testified on the trial that, after making said last examination and tests, the nearest he could come to it in the way of a diagnosis was that whatever there was on the cord, whether a tumor, a swelling or a disturbance of the bone, must be about the sixth, seventh and eighth dorsal cord levels or segments, which would be the fifth, sixth and seventh dorsal vertebrae. He made a written report at the time as to his findings and conclusions and turned the report over to Dr. Schroeder, who finally decided to perform an operation and invited Yudelson to be present and the latter attended it (in Wesley hospital on August 18, 1921) but took no part therein. Van Alstine, who acted as an assistant to Schroeder at the time, testified that "Dr. Schroeder selected the field of operation"; that he did not know just what vertebrae Schroeder opened, but that two or three were exposed and two small plaques were removed. There was apparently no improvement in plaintiff's condition, and on May 15, 1922, Dr. Schroeder performed a second similar operation, at which both Van Alstine and Yudelson were present. Apparently, no improvement in plaintiff's condition followed this operation, and he remained partially paralyzed in the lower part of his body. Prior to the operation Yudelson told

plaintiff that in his opinion it would not improve his condition and Yudelson took no part in it. The testimony is not entirely clear as to just what vertebrae were opened at the first and second operations, although it is probable that the first operation extended as high as the fifth dorsal vertebrae, and the second, as high as the fourth or third. About the middle of July, 1922, a third operation was performed by Dr. Schroeder, at which Drs. Ralph Hamill and Van Alstine were present but defendant was not. This operation followed examinations and tests made by Dr. Hamill, who had been called into the case, and was probably in the neighborhood of the second and third dorsal vertebrae. It was higher up than the second operation, as the second had been higher than the first. Defendant protested against the performing of this operation, expressing the opinion that it would not materially improve plaintiff's condition. According to the testimony of Dr. Hamill (plaintiff's witness), at this third operation, a growth or thickening, described as a bony growth, was found, which, he said, had blocked the flow of the spinal fluid, and which was removed. According to the testimony of Dr. Van Alstine (plaintiff's witness) there was a question at the operating table as to whether or not the laminae were unusually thickened and had exerted any undue pressure upon the cord. Apparently there was no material improvement in plaintiff's condition after this operation, although plaintiff testified that in some respects he felt better and could do "many things he could not do before." The paralysis or paraplegia, however, continued and plaintiff was unable to walk. Dr. Hamill further testified: "I have no idea what caused the paraplegia other than that there may have been many other causes. As a matter of fact the paraplegia did not disappear when the growth was removed, so obviously that was not the entire cause of the paralysis. * * * I have no opinion as to what

the effect upon the paraplegia would have been if the growth had been removed in 1921. * * * I could not state how long the substance that was removed on the third operation had been growing. The only thing that would throw any light on it was that the spinal fluid *flowed freely in the first operation.*'' Several physicians, claiming to be experts in neural and spinal troubles, but who had not treated plaintiff, were called as plaintiff's witnesses and they gave testimony in response to certain hypothetical questions, among them Dr. Henry Bridgeman, practicing his profession in the State of Michigan. In response to a hypothetical question he was allowed by the court to express the opinion, over defendant's specific objections that the question was not proper under the evidence and any answer thereto would be entering the realm of speculation, that ''if said bony growth had been removed at the first operation the patient. would have been all right.''

Plaintiff's counsel contend that the trial court erred in instructing the jury at the close of all the evidence to return a verdict in favor of defendant, and for the reason that there is contained in the present record some evidence of negligence on the part of defendant proximately causing plaintiff's ailments and disabilities. The argument is, as we understand it, that defendant was guilty of negligence in his original diagnosis, in not ascertaining that the seat of plaintiff's trouble was in the higher dorsal vertebrae and in not seeing to it that the first operation, to be performed by Dr. Schroeder, was performed in that region rather than lower down, and that plaintiff's condition at the time the action was commenced and at the time of the trial was the result of defendant's said negligence.

Mr. Chief Justice Taft, when sitting as a circuit judge in the United States Circuit Court for the southern district of Ohio, said in his opinion in *Ewing v. Goode,* 78 Fed. 442, which was a case brought against

a surgeon and oculist for damages because of alleged negligent and unskilful treatment to plaintiff's eye (p. 443):

"Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskilful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury.  *  *  *  A physician is not a warrantor of cures. If the maxim, *'Res ipsa loquitur,'* were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

These principles have been stated in several decisions of the Appellate Courts of this State. (*Sims v. Parker,* 41 Ill. App. 284, 286; *McKee v. Allen,* 94 Ill. App. 147, 153; *Moline v. Christie,* 180 Ill. App. 334, 338; *Phebus v. Mather,* 181 Ill. App. 274, 277; *Graiziger v. Henssler,* 229 Ill. App. 365, 374.) In the *Moline v. Christie* case, it is said that it seems to be settled that the proof of the defendant's negligence "can only be established by the testimony of experts skilled in the medical and surgical profession." In the present case the record is barren of any affirmative evidence showing negligence or want of skill on defendant's part. No physician or expert witness expressed the opinion that defendant, in and about his diagnosis of plaintiff's condition or in his examinations of plaintiff, failed in any particular to exercise proper care or skill. On the contrary the evidence shows that defendant was unusually diligent and painstaking. In the *Sims v. Parker* case, *supra,* it is said: "Proof of a bad result or of a mishap is of itself no evidence of negligence or lack of skill.  *  *  *  Before a recovery

could be had against defendant, it must be shown that his treatment was improper or negligent, not merely that he was mistaken, or that his treatment resulted injuriously to plaintiff.'' As to plaintiff's counsel's argument that defendant's negligence consisted in not properly diagnosing and locating the seat of plaintiff's troubles higher up in the spine than he did, and in not objecting at the first operation to the field of operation selected, one sufficient answer is, we think, that the undisputed evidence is that Dr. Schroeder, the surgeon, ''selected the field of operation,'' and that he was employed by plaintiff, through Dr. Van Alstine, independently of defendant. Furthermore, the undisputed evidence discloses that prior to the first operation the tests made by Dr. Van Alstine as to the flow and pressure of the spinal fluid indicated that the field selected was the probable proper field. Furthermore, if it could be held, considering the discoveries on the third operation as testified to by Dr. Hamill, that Dr. Schroeder was negligent in the first operation in not operating higher up on the spine, such negligence could not, under all the facts and circumstances in evidence, be imputed to defendant. (*Brown v. Bennett,* 157 Mich. 654, 657–658; *Beckwith v. Boynton,* 235 Ill. App. 469, 484.) After carefully reviewing the present record, and in the light of the authorities above referred to, we are of the opinion that there is no evidence tending to show that defendant was guilty of any negligence or want of skill as regards his diagnosis of plaintiff's ailment or malady or in any of his treatments of plaintiff in connection therewith. And we are also of the opinion, as to the other element necessary for a recovery, that there is not in the record any *competent* evidence tending to show that plaintiff's ailments and disabilities were the proximate result of any negligence or want of skill on defendant's part. When defendant was first retained by plaintiff, through Dr. Van Alstine, plaintiff was suffering from severe pains

in his back and some paralysis of the lower part of his body. This paralysis was progressing and had increased somewhat up to the time of the first operation. Following this operation there was no improvement. The paralysis kept on increasing, as it did after the second operation. Following the third operation, at which according to Dr. Hamill's testimony a bony growth was found and removed, there was apparently no improvement as regards plaintiff's paralysis, although plaintiff testified that in some respects he felt better. These facts do not reasonably tend to show, if the first operation had been performed where the third was performed, that there would have been any different result. Even Dr. Hamill (plaintiff's witness) testified that he had no idea what caused plaintiff's paralysis "other than that there may have been many other causes," and he further testified, because plaintiff's paralysis did not disappear after the third operation when the bony growth was removed from one of the higher up vertebrae, "obviously *that* was not the entire cause of the paralysis." Of all of plaintiff's expert witnesses, Dr. Bridgeman was the only one who suggested, in answer to a hypothetical question, that a different result *might* have been obtained, and plaintiff's condition *"would* have been all right," had the growth (which was removed at the third operation) been removed at the time of the first operation. This testimony assumes that the growth was there when the first operation was performed, of which there is no evidence, and is so highly speculative in its nature that it was not proper or competent to be considered by the jury.

For the reasons indicated we think that the trial court properly instructed the jury to find defendant not guilty and properly entered the judgment appealed from against plaintiff. Accordingly the judgment will be affirmed.

*Affirmed.*

FITCH and BARNES, JJ., concur.